USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/28/20_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
   **DELMAR A. MOORE,**                    :
                                             :
                 **Plaintiff,**  :
                                             :
    **-against-**                          :      **1:19-cv-03588 (ALC)**
                                             :
                                             :      **OPINION AND ORDER**
                                             :
                                             :
   **COMMISSIONER OF THE SOCIAL**         :
   **SECURITY ADMINISTRATION,**           :
              **Defendants.**  :
                                             :
                                             :
                                             :
------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

    This is an action for review of the Commissioner of Social Security's ("Commissioner")

decision that Plaintiff Delmar Moore ("Plaintiff") is not entitled to Social Security Disability or

Supplemental Security Income benefits. Currently pending are cross motions for judgment on the

pleadings. The Court has considered the parties' arguments and for the reasons set forth below,

the Plaintiff's motion is GRANTED and the Commissioner's cross-motion is DENIED.

**I.   BACKGROUND**

    **A.  Procedural Background**

    On May 8, 2014 and May 12, 2014, Plaintiff filed applications for Social Security

Disability benefits and Supplemental Security Income payments under the Social Security Act

("Act"). Plaintiff attended a hearing before Administrative Law Judge ("ALJ") Elias Feuer on

October 13, 2016, May 18, 2017, and January 23, 2018. In a decision dated May 2, 2018, the

ALJ found Plaintiff to be not disabled. On February 27, 2019, the Appeals Council denied

Plaintiff's request for review, and on April 23, 2019, Plaintiff brought this action for review of the ALJ's decision. Plaintiff contends that the Commissioner's decision that he is not disabled per se is not supported by substantial evidence. Plaintiff also alleges that the ALJ improperly weighed his treating physician's opinion and improperly assessed his credibility. Therefore, the parties filed the instant cross-motions for judgment on the pleadings.

### B.  Plaintiff's Background

Plaintiff was born in January 1971 and was 42 years at the onset of his alleged disability on September 13, 2013. (AR 137.) He worked as a computer technician and a security guard. (*Id.* 86-87.)  After finishing one year of college and a computer career program, he worked as an ATM technician from 2002-2013.  (*Id.* 404-05, 422, 1352.)  Plaintiff initially stopped working because he was "wrongfully terminated."  (*Id.* 404, 1352.)  He testified that he challenged the termination and was reinstated, but could not return to work due to his health. (*Id.* 1352-53.) Plaintiff continued to look for full-time IT work during the relevant period.  (*Id.* 1357-60.)

Plaintiff said he needed no help with personal needs and grooming and no reminders to take his medication; dropped off and picked up his children from camp daily; shopped for food, clothing, and house supplies; attended church twice weekly; enjoyed recreational time with his mother and children, who lived with him, regularly; did laundry and cleaned the house with assistance; and was able to drive, take public transportation, pay bills, count change, and handle a savings account.  (*Id.*  417-19, 426-28.)  He also stated that he prepared meals for himself three days a week, but not when healing from a seizure, or experiencing depression or headaches.  (*Id.* 41.)

### C.  Plaintiff's Alleged Disabilities and Symptoms

Plaintiff alleges that he struggles with epilepsy, depression, and an anxiety disorder. Plaintiff testified that he experiences "grand seizures," involving loss of consciousness, convulsions, biting, and other symptoms, as well as smaller seizures, in which he would "tap out," "pass out," lose track of what he was saying or doing, stare into space, or hear auditory hallucinations.  (*Id.* 76, 113, 115-16.)  He also stated that he took his anti-epilepsy medicine regularly, and that he had not missed a dose in the six months preceding the January 2018 hearing.  (*Id.* 64-54, 67.)

Plaintiff also claims he has headaches, forgetfulness, panic attacks, depression, memory loss, and difficulty focusing and finishing tasks.  (*Id.* 112-13, 421, 425.)  However, he stated that he could follow spoken and written instructions and had no issues getting along with others. (AR 425-26.)  He testified that Trazadone helped, but not "100 percent."  (*Id.* 104.)

### D.  Evidence of Medical Treatment in the Record

#### a.  Treatment for Epilepsy and Seizures

In May 2014, Dr. Sandeep Gulati, a board-certified neurologist noted that Plaintiff's last seizure was in December 2014 during his sleep.  (*Id.* 972, 974.)  Plaintiff complained of symptoms such as wandering, shaking, and confusion the previous day.  (*Id.* 972.)  On neurological examination, Dr. Gulati observed a normal mental status examination ("MSE"), including intact long-term and short-term memory, immediate recall, repetition, and naming. (*Id.* 974-75.). The doctor also observed normal examinations of Plaintiff's cranial nerves, motor function, senses, reflexes, coordination, and gait.  (*Id.* 975.)  Dr. Gulati diagnosed localized epilepsy with complex seizures and stated that Plaintiff would continue taking Keppra, an anti-

epilepsy medication, twice a day.  (*Id.* 975.)  Plaintiff reported that he was tolerating Keppra but acknowledged reduced compliance because of difficulties paying for his prescription.  (*Id.*  974.)

Dr. Gulati examined Plaintiff three additional times in June and July of 2014. In June, Plaintiff complained of two seizure episodes: one in which his eyes "blanked out" and he fell; and another in which he was wandering, shaking, and confused.  (*Id.*  976.)  Dr. Gulati observed normal examination findings and prescribed Depakote to treat seizures, manic episodes related to bipolar disorder, and headaches, in addition to Keppra. (*Id.*  977.)  On July 14, 2014, Plaintiff complained of nightmares, chest palpitations, and chest pain.  (*Id.*  978.)  Dr Gulati again documented normal examination findings and added a diagnosis of unspecified sleep disturbance.  (*Id.* 979.)

On July 27, 2014, Plaintiff sought treatment for a seizure at Roosevelt Hospital. (*Id.* 1041.) The next day, Plaintiff had a seizure in Dr. Gulati's waiting room and reported multiple seizures during the previous weekend, despite medication compliance.  (*Id.* 980.)  Dr. Gulati added "frequent breakthrough events" to his diagnosis and sent Plaintiff to undergo epilepsy monitoring.  (*Id.* 981.)  Later that day, Plaintiff was admitted to the hospital for treatment where he described having seizures whenever he went to sleep; waking from sleep with panic attacks and screaming; and full body convulsions.  (*Id.* 1052, 1055.)  In the emergency room, Plaintiff had a seizure with full body convulsions lasting around 1 minute.  (*Id.* 1055.)  Plaintiff was given Keppra and an hour and half later, he had a second seizure with convulsions.  (*Id.*)  Later that day, Plaintiff had a third seizure.  (*Id.*)  Plaintiff was diagnosed with seizure disorder and prescribed Lorazepam to relieve anxiety, Keppra, Depakote, and Fosphenytoin to treat seizures. (*Id.* 1055, 1059.)

On July 29, 2014, Dr. Alexis Boro, a board-certified neurologist at Montefiore Hospital, evaluated Plaintiff while he was hospitalized.  (*Id.* 1065.)  On neurological examination, Dr. Boro observed that Plaintiff was experiencing frequent complex partial seizures characterized by behavioral arrest, head turn to the left, and dystonic posturing and shaking of the left upper extremity.  (*Id.*)  He noted that an EEG from July 28, 2014, revealed five brief electrographic seizures arising from the right brain hemisphere, and that Plaintiff continued to have "brief and subtle seizure patterns arising from the same area" that morning.  (*Id.* 1066.)  Accordingly, Dr. Boro diagnosed resolving non-convulsive status, increased Plaintiff's dose of Depakote and Keppra, and ordered an MRI of the brain, which yielded unremarkable results.  (*Id.* 1065-67, 1093).

On September 15, 2014, Plaintiff returned to Dr. Gulati and reported no seizures since being discharged from the hospital on August 4, 2014.  (*Id.* 1114).  Dr. Gulati recorded normal exam findings and recommended that Plaintiff continue with the increased dosages of Keppra and Depakote.  (*Id.* 1116.)  Plaintiff deferred starting Klonopin.  (*Id.*)  The record contains no further evidence of treatment for seizures until March 31, 2015, when Plaintiff was admitted for a scheduled evaluation of his seizures.  (*Id.* 1117.)  Plaintiff reported a history of seizures, as well as smaller episodes of staring and wandering, and explained that he experienced about two of each event per week.  (*Id.* 1129.)  Plaintiff reported taking a smaller dosage (500mg) of Depakote than last prescribed (750mg). (*Id.* 1116, 1129, 1147.)  During this admission, EEG monitoring revealed one electroclinical seizure while he was on medication, as well as two electroclinical seizure after he was tapered off of his medications. (*Id.* 1119-20.)  Plaintiff was given Valium, restarted on Depakote, and started on Carbamazepine, another anti-epileptic medication.  (*Id.* 1120.)  Plaintiff was discharged on April 7, 2015 in stable condition with

prescriptions for Carbamazepine, Synthroid, Amlodipine, Losartan, and Depakote.  (*Id.* 1123-27.)

On August 3, 2014, Plaintiff underwent an occupational therapy evaluation with Dr. Esther Rollhaus, a board-certified psychiatrist.  (*Id.* 1075.)  Dr. Rollhaus observed that Plaintiff was lethargic; could not correctly identify the day or date; could follow one-step instructions, but required cues to open his eyes and perform tasks; and had slurred speech, decreased attention, insight, problem-solving skills, balance, and coordination, and increased impulsivity.  (*Id.* 1075-76.)  Dr. Rollhaus diagnosed history of seizures and depression, treatment for a status epilepticus with improvement on Depakote and Keppra.  (*Id.* 1078.)  Plaintiff was discharged on August 4, 2014.  (*Id.* 1147.)  Discharge notes indicate that Plaintiff attempted to elope on August 2 and he refused the hospital's offer of home care services.  (*Id.*)

On July 13, 2015, Plaintiff was treated in the ER at Weiler Hospital for a variety of complaints.  (*Id.* 1160.)  Plaintiff reported having a seizure three days prior and seizures and blackouts three times per week generally.  (*Id.* 1160, 1163.)  He also claimed medication compliance, but provided that he "double[d] up" on his medication when he missed a dose.  (*Id.* 1166.)  During the hospital stay, a CT scan of the head indicated an ill-defined linear hyper density in the left frontal lobe, possibly representing acute subarachnoid hemorrhage, or postictal change versus artifact.  (*Id.* 1175.)  Plaintiff told hospital staff that he needed to use the bathroom and eloped.  (*Id.* 1168.)

On December 24, 2015, Plaintiff was admitted to the hospital to undergo epilepsy monitoring for capture/characterization of possible seizures.  (*Id.* 1227.)  He reported that since 2007, he had been experiencing episodes of jumping out of sleep screaming, sometimes followed

by shaking episodes involving tongue biting and urinary incontinence up to 3 times per week. (Id.)  During this admission, Plaintiff experienced several nocturnal electroclinical seizures.

On December 26, 2015, Dr. Alison May, a board-certified neurologist at Montefiore, examined Plaintiff.  (*Id.* 1239.)  Dr. May observed the clinical appearance of eye-opening and fluttering.  (*Id.*)  An EEG documented "many nocturnal seizures" with generalized attenuation of background frequencies with overlying fast and generalized rhythmic high-amplitude discharges. (*Id.* 1239-40.)  Dr. May added Vimpat, an anticonvulsant, to Plaintiff's regimen, increased his dose of Depakote, and discontinued Tegretol.  (*Id.* 1240.) The following day, progress notes documented decreased seizure frequency, but increased drowsiness.  (*Id.* 1243, 1246.)  Plaintiff was discharged on December 29, 2015.

Between February 2016 and September 2017, Plaintiff was treated by Dr. Boro. On February 25, 2016, Plaintiff reported one seizure over the past month and "tap[ping] out" twice a week for one-minute spells of "behavioral arrest," but had not experienced a daytime generalized tonic-clonic seizure or syncopal-seeming episode since October 2015.  (*Id.* 1251.)  Plaintiff reported taking Vimpat three times per day.  (*Id.*)  Dr. Boro diagnosed partial symptomatic epilepsy with complex partial seizures, intractable, with status epilepticus, chronic. (*Id.* 1254.) He increased Plaintiff's Vimpat dosage. (*Id.* 1259.)

On April 26, 2016, Plaintiff returned to Dr. Boro and reported one or more complex partial seizures per week.  (*Id.*)  However, Dr. Boro noted that Plaintiff's true seizure frequency based on most recent monitoring was likely "considerably higher," despite a maximally tolerated dose of Depakote.  (*Id.*)  He decreased Plaintiff's dosage of Depakote and increased Vimpat.

On July 14, 2016, a PET scan of Plaintiff's brain revealed diffusely decreased FDG activity involving the right frontal, parietal and temporal lobes, focal FDG activity at the mid nasopharyngeal region for which malignancy could not be excluded.  (*Id.* 1266.)

On August 16, 2016, Plaintiff reported to Dr. Boro that he had experienced one generalized tonic-clonic seizure and one syncopal episode since April, and that he had only been taking half the prescribed dosage of Depakote.  (*Id.* 1260.)  Dr. Boro's neurological examination revealed depression affect and significant psychomotor slowing.  (*Id.* 1262.)  He assessed longstanding medically intractable focal epilepsy and significant psychiatric disease.  (*Id.* 1263.) Dr. Boro advised that Plaintiff be admitted to the EMU to quantify his seizures and ordered laboratory testing to verify Plaintiff's medication levels.  (*Id.*)  Despite multiple attempts by Dr. Boro's office to schedule the recommended monitoring session, Plaintiff did not comply.  (*Id.* 1272.)

On November 17, 2016, Plaintiff reported no generalized tonic-clonic seizures since his last visit, but did report two to three syncopal-seeming episodes.  (*Id.* 1273.)  Dr. Boro diagnosed partial primary intractable epilepsy with impairment of consciousness.  (*Id.* 1275.) Plaintiff remained on Depakote, Vimpat, and Levothyroxine.  (*Id.* 1276.)

On February 23, 2017, Dr. Boro noted that Plaintiff was admitted to the EMU for nine days in December and experienced no seizures during that time, despite having his medications tapered off.  (*Id.* 1282.)  He was missing less than 1 dose of his medications per week.  (*Id.* 1321.)  Dr. Boro's neurological examination revealed less psychomotor slowing and depression than at the last visit, and otherwise normal exam findings, and increased Plaintiff's Vimpat.  (*Id.* 1285-86.)

On June 15, 2017, Dr. Boro conducted a neurological examination which revealed a depressed affect.  (*Id.* 1327). Plaintiff opted to begin a trial of Onfi, an anti-epilepsy medicine, and Dr. Boro decreased his prescription for Vimpat.  (*Id.* 1328.)  The following month, Plaintiff reported one convulsive seizure out of sleep and "tapping out" 3-4 times a day since June.  (*Id.* 1329.)  Dr. Boro concluded that the side effects may have resulted from the combination of Onfi and Depakote.  (*Id.* 1333.)  Consequently, he decreased Plaintiff's dose of Depakote and restarted Onfi.  (*Id.*)

On September 5, 2017, Plaintiff reported one convulsive seizure since July and 2-3 smaller spells per week.  (*Id.* 1334.)  Plaintiff opted against surgery and was unwilling to adhere to dietary modification.  (*Id.* 1337.)  Dr. Boro increased his dose of Onfi and decreased Depakote.  (*Id.*)

### b.  Plaintiff's Psychiatric Treatment

Dr. Peter Heiman, a board-certified psychiatrist, regularly saw Plaintiff from November 2014 through May 2017.  (*Id.* 1293, 1296-1300.)  Plaintiff complained of difficulty sleeping in November and December 2014, July 2015, and February and March 2017; tension in July 2015; headaches in February 2016; forgetfulness and sound sensitivity in April and May 2016 and March 2017; irritability in April 2016; bumping into and dropping things in June 2016; and losing things in July 2016.  (*Id.*)  He also frequently discussed his seizure activity, progress of his treatment for epilepsy, and treatment for his thyroid condition with Dr. Heiman.  (*Id.*)

Dr. Heiman prescribed Ambien, Lexapro, and Trazadone.  (*Id.* 1297–99.)  He prescribed Ambien in December 2014, renewed it in July 2015, and prescribed it again in January 2017.  (*Id.*)  He prescribed Lexapro in October 2015, renewed it in March 2016, increased the dosage in

May 2016, further increased the dosage in November 2016, and decreased the dosage in April 2017.  (*Id.* 1297˜1300.).  He prescribed Trazadone in February 2017.  (*Id.* 1300.)

### E.  Medical Opinions in the Record

#### a.  Consultative Internal Medicine Evaluation: Marilee Mescon, M.D.

On August 15, 2014, Dr. Mescon evaluated Plaintiff at the behest of the Social Security Administration.  (*Id.* 982.)  Plaintiff was cooperative and fully oriented, with normal posture and motor behavior, and appropriate eye contact.  (*Id.* 983-84.)  Dr. Mescon diagnosed high blood pressure and a seizure disorder.  (*Id.* 985.)  Regarding appropriate work, Mescon recommended Plaintiff avoid driving a motor vehicle and "environments where he is exposed to heights and . . . heavy machinery."  (*Id.*)

#### b.  Consultative Psychiatric Evaluation: David Mahoney, Ph.D.

On August 15, 2014, Dr. Mahoney evaluated Plaintiff at the behest of the Social Security Administration.  (*Id.* 987-90.)  Dr. Mahony's diagnosis consisted of: "mild neurocognitive deficits secondary to psychiatric problems and seizure disorder, unspecified anxiety disorder, major depressive disorder - moderate, and seizure disorder," and stated that "the results [we]re consistent with psychiatric problems, [which would] interfere with [Plaintiff's] ability to function on a daily basis."  (*Id.* 989.)

He opined that due to psychiatric difficulties, Plaintiff has moderate difficulties maintaining attention, concentration, a regular schedule, learning new tasks, performing complex tasks, making appropriate decisions, relating adequately with others, and dealing with stress. (*Id.*)  He further concluded that Plaintiff had no limitations for following and understanding simple directions, performing simple tasks independently, and managing his own funds. (*Id.* 989-

90.)  Dr. Mahoney had limited information to draw from due to the lack of medical records.  (AR 988.)

### c.   State Agency Consultant: L. Blackwell, Ph.D.

On September 8, 2014, Dr. Blackwell reviewed the medical records submitted up to that date and determined that Plaintiff's psychiatric impairments were non-severe and did not meet or equal any Listings.  (*Id.* 143-44.)

### d.   Psychiatric Evaluation: Peter Heiman, M.D.

In October 2016, Dr. Heiman reviewed Plaintiff's medical records in conducting a Residual Functional Capacity Assessment ("RFC"). Dr. Heiman checked boxes indicating that Plaintiff had a number of moderate and marked limitations.  (*Id.* 545-56.)  He opined that Plaintiff was moderately limited in the ability to understand and remember very short and simply instructions, ability to make simple work-related decisions, and the ability to be aware of normal hazards and take appropriate precautions.  (*Id.*)  He also opined that Plaintiff was markedly limited in his abilities to sustain an ordinary routine without special supervision, carry out detailed instructions, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*)  He explained that Plaintiff's seizure disorder had "significantly impaired his cognitive capacity" and that depression had contributed to this impairment "to some degree."  (*Id.* 547.)

### e.   Treating Neurologist: Alexis D. Boro, M.D.

In January 2018, Dr. Boro sent two letters noting that Plaintiff and his family were aware of "2-3 seizures per week"; that Plaintiff had "failed trials of at least five medications"; and that trials of medications "are unlikely to render him seizure free."  (*Id.* 1320, 1346.)  He stated that Plaintiff "misse[d] occasional doses of his antiepileptic medications," but that missing doses is

11

"norm[al for] patients taking multiple medicines." (*Id.*)  Further, Dr. Boro opined that he did not

believe Plaintiff's "non-compliance contributes significantly to the frequency of his seizures."

(*Id.*)

In the January 29 letter, Dr. Boro also noted that recent blood tests reflected medication

adherence, and that during EMU monitoring, Plaintiff experienced 19 seizures in a single night

even though the hospital was administering his medications on a schedule.  (*Id.* 1346-47.)

### f.  Medical Expert: Justin A. Willer, M.D.

After a review of Plaintiff's medical records, Dr. Justin A. Willer, a consulting

neurologist, responded to Medical Interrogatories posed by the ALJ on June 28, 2017.  (*Id.* 1311-

1319.)  Dr. Willer concluded that Plaintiff's impairments did not meet or medically equal a listed

impairment because Plaintiff was not fully compliant with his medications.  (*Id.* 1315.)  He

found "plenty of . . . [evidence] that indicate [that Plaintiff is] not taking his medicine." (AR

52.)  Regarding appropriate work, Dr. Willer's ultimate conclusion was that Plaintiff should be

restricted from driving, operating power tools, and working at heights.  (*Id.* 1316.)  Additionally,

he refrained from forming an opinion regarding cognitive deficits reflected in the psychiatric

consultative examination without a neuropsychiatric evaluation.  (*Id.*  60-61). On January 23,

2018, Dr. Willer testified that some treatment notes indicated that Plaintiff experienced one

generalized tonic-clonic seizure per month, while other notes do not reflect that frequency.  (*Id.*

47-49.)

### g.  Vocational Expert: Linda Voss

At Plaintiff's hearing, the Linda Voss testified as a Vocational Expert ("VE").  (*Id.* 86.)

The ALJ asked Ms. Voss whether an occupation existed for an individual of Plaintiff's age,

education, work history, and RFC.  (*Id.* 87-89.)  She testified that such an individual could

perform the following occupations: photocopying machine operator with 214,312 jobs existing

nationally; marker with 304,746 jobs existing nationally; and routing clerk with 52,607 jobs

existing nationally.  (*Id.* 88-89).  She further opined that if an individual were absent from work

more than twice per month, he could not maintain employment.  (*Id.* 89-90).

## II.  STANDARDS OF REVIEW

### A.  Judgment on the Pleadings

"A party is entitled to judgment on the pleadings under Rule 12(c) if he or she can

establish that no material facts are disputed and that he or she is entitled to judgment as a matter

of law." *Wright v. Barnhart*, 473 F.Supp.2d 488, 492 (S.D.N.Y. 2007).

### B.  Judicial Review of the Commissioner's Determination

In reviewing Social Security disability determination, courts engage in a two level

inquiry: "First, the Court determines whether the Commissioner applied the correct legal

standard in the disability hearing….Second, the Court must review the record to determine

whether the Commissioner's decision is supported by 'substantial evidence.'" *Id.* (internal

citations omitted). Substantial evidence has been defined by the Supreme Court as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion," which must be

"more than a mere scintilla." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting

*Richardson v. Perales,* 402 U.S. 389, 401 (1971).  "The substantial evidence test applies not only

to findings of basic evidentiary facts but also the inferences and conclusions drawn from such

facts." *Lecler v. Barnhart*, 2002 WL 31548600, at *4 (S.D.N.Y. Nov. 14, 2002).  Additionally, a

court "may not substitute its own judgment for that of the [Commissioner], even if it might have

reached a different result upon a *de novo* review. *Id.*

### C. Disability Framework

To qualify for Social Security benefits, a claimant must prove "disability" which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. 423(d)(1)(A); *Gennardo v. Astrue*, 333 F. App'x 609, 610 (2d Cir. 2009); *see Ortiz v. Saul*, 2020 WL 1150213, at *5 (S.D.N.Y. Mar. 10, 2020). The impairment must be demonstrated by "medically acceptable clinical and laboratory techniques," 42 U.S.C. 423(d)(3), and it must be "of such severity that [the claimant] is unable to do his previous work" and cannot engage in any other "kind of substantial gainful work which exists in the national economy."  *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing 42 U.S.C. 423(d)(2)(A)).

The Commissioner has established a five-step sequential evaluation for adjudication of disability claims, 20 C.F.R. § 404.1520(a) and 416.920(a), which the Second Circuit has articulated as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform . . . The claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 111 (2d Cir. 2010) (quoting *Rosa v. Callahan*, 168 F. 3d 72, 77 (2d Cir. 1999)).  In making these decisions, the Commissioner must consider objective medical evidence, opinions of examining physicians, subjective evidence of pain and disability and a claimant's age, educational background and work history. *Mongeur*, 722 F.2d at 1037.

## III.  DISCUSSION

### A.  The ALJ's Decision

The ALJ evaluated Moore's claim pursuant to the sequential evaluation regulations discussed above, 20 C.F.R § 404.1520, § 416.920, and found that Moore had the following severe impairments: Epilepsy, Seizures, Depression and Anxiety Disorders. The ALJ determined, however, that Moore did not have an impairment that met or medically equaled in severity one listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. The ALJ further found that Moore had the residual, functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and §416.967(b), including the ability to sit and to stand/walk six hours each in an eight-hour workday with normal breaks and lift/carry ten pounds frequently and twenty pounds occasionally. However, the ALJ also determined that Moore must avoid operating motor vehicles, working at unprotected heights, and operating power tools or heavy machinery.

The ALJ next found that, based on his residual functional capacity, and the requirements of his past work, Moore is unable to perform past relevant work as it requires a greater exertional and non-exertional capacity than he possesses. Nevertheless, considering Moore's age, education, work experience, and ability to perform simple routine tasks, the ALJ found that there are jobs that exist in significant numbers in the national economy such as a photocopy machine

operator, marker, and routing clerk that Moore can perform. Therefore, the ALJ concluded that Moore was not disabled.

On this appeal, Moore focuses on the last three steps of the ALJ's analysis, challenging the evidentiary basis for the ALJ's ultimate determination that, despite Plaintiff's inability to perform his past relevant work, he was capable of working. In particular, Plaintiff makes three arguments: (1) that Moore is *per se* disabled under Medical Listing 11.02A and/or 11.02B; (2) the ALJ erred by giving the opinions of Moore's treating physician less than controlling weight; (3) that, the ALJ erred by concluding that Moore's testimony was inconsistent with the medical and nonmedical evidence in the record. Each of these arguments are addressed, in turn, below.

### B.  The ALJ properly held that Plaintiff does not meet one of the Medical Listings in Appendix 1

The ALJ concluded that Moore failed to meet his burden of demonstrating that he was compliant with his prescribed treatment, as required by Medical Listing 11.02A and 11.02B. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (requiring medical evidence that meets all criteria of a listing). The Court now must determine whether there was substantial evidence for this conclusion. *See Johnson v. Astrue*, 563 F. Supp. 2d 444, 455 (S.D.N.Y. 2008).  Even the "absence of an express rationale" from the ALJ does not prevent a court "from upholding the ALJ's determination regarding [a] plaintiff's claimed listed impairments," if "portions of the ALJ's decision and evidence before him indicate that his conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F. 2d 464, 468 (2d Cir. 1982).

 At the time of the ALJ's decision, Medical Listing 11.02 provided, in relevant part: Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

    A.  Generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment.

OR

    B.  Dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

20 C.F.R Pt. 404, Sub. pt. P, App'x §§ 11.02A, 11.02B.  The regulations define "adherence to prescribed treatment" as "tak[ing] medication(s) or follow[ing] other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months" and, when counting seizures, the period specified "cannot begin earlier than one month after you began prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 11.00H4, 11.00C.

The ALJ reached her decision by examining the medical record, Dr. Willer's opinion that Moore did not adhere to the medications, and Dr. Boro's treatment notes from 2016 and 2017. Specifically, Dr Boro's reports from February, April, August, and November of 2016, and February, June, and July of 2017 include notes that Moore admitted to missing one dose of medicine per week.  (*Id.* 1251, 1256, 1261, 1273, 1283, 1325, 1330, 1320, 1346.)  In May and June 2014, Moore told Dr. Gulati about his "reduced compliance" with the prescribed medication.  (*Id.* 974, 976.)  In April 2015, Moore also reported taking only 500mg dose twice a day despite Dr. Boro's prescription of 750mg twice a day. (*Id.* 1129.)  Together, these reports constitute substantial evidence to support the ALJ's determination that Moore did not meet the required elements of the Listing. To be sure, there is evidence in the record suggesting that Moore was at times compliant with his medication (*see Id.* 980 ("compliant with RX"), 90 ("compliant with medication as prescribed")).  But that is not the test. Where, as here, the evidence is mixed—and substantial evidence supports the ALJ's factual finding concerning the frequency of Moore's seizures despite his adherence to prescribed treatment—the Court must defer to that finding and uphold the ALJ's Listing 11.02 determination. *Pena Lebron v. Comm'r of Soc. Sec.*, No. 18-cv-125 (BCM), 2019 WL 1429558, at *13 (S.D.N.Y. Mar. 29, 2019).  *See Vazquez v. Apfel*, No. 97-CIV-5370 (SAS), 1998 WL 542324, at *5-6 (S.D.N.Y. Aug. 24, 1998)

(upholding ALJ's . . . determination, despite "conflicting reports regarding . . . evidence that the claimant failed to take all prescribed medication).

**B. The ALJ did not properly apply the "treating physician" rule regarding Plaintiff's mental residual functional capacity.**

Moore also argues that the ALJ improperly weighed Dr. Heiman's opinion by not giving it controlling weight. The Second Circuit has consistently applied the SSA regulation's "treating physician" rule, which provides that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2) (emphasis added); *See Roma v. Astrue*, 468 F. App'x 16, 18 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  "[T]he opinion of a treating physician that is inconsistent with other substantial evidence in the record is not entitled to controlling weight."  *Pimenta v. Barnhart*, 05 CIV. 5698, 2006 WL 2356145, at *5 (S.D.N.Y. Aug. 14, 2006).

Where controlling weight is not given to a treating physician's opinion, the Court should consider the following, nonexclusive "*Burgess* factors" in determining the weight to be given such an opinion:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.

20 C.F.R. 404.1527(d)(2); *Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019) (citing *Burgess*, 537 F.3d at 129).  Even if the ALJ does not "explicitly apply" the regulatory factors, the ALJ's determination will be affirmed as long as "a searching review of the record" assures the

Court "that the substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 96. At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (quoting 20 C.F.R. 404 1527(c)(2)).

The ALJ acknowledged that Dr. Heiman was Moore's "treating physician," and noted that he began treating Moore in November of 2014 through at least May 2017. (*Id.* 23). The ALJ afforded Dr. Heiman's opinion only "some weight" because he concluded that his opinion "is not well supported by limited treatment notes" and is flawed because of the absence of a "neuropsychiatric evaluation." (*Id.* 24). In particular, the ALJ commented that "[t]he opinion offered appears based more on subjective complaints and sympathy, rather than objective evidence" and is "inconsistent with the wide range of activities of daily living performed by the claimant, including household chores and preparing meals." (*Id.* 24) (citing 5E, 7E, 6F). This explanation falls short of the ALJ's duty to provide good reasons for affording a treating physician's opinion less than controlling weight. First, the ALJ's statement that Dr. Heiman's opinion was based on subjective rather than objective evidence is conclusory. He provides no support in the record for why he reached this conclusion and substitutes impermissibly his own lay interpretation of Dr. Heiman's opinion.

Further, the ALJ does not appear to consider the extent to which Dr. Heiman's statement is consistent or inconsistent with substantial evidence in the record. The one inconsistency noted is the documentation regarding Moore's abilities to perform activities involved in daily living like household chores and meal preparation. That Moore can perform these relatively simple tasks is not inconsistent with Dr. Heiman's opinions regarding Moore's concentration, cognitive, and social interactive abilities. The Commissioner argues that a review of the record

19

demonstrates that Dr. Heiman's opinions are inconsistent with Dr. Gulati's and Dr. Boro's submissions. In particular, the Commissioner noted that Dr. Boro documented full orientation, normal, affect, and intact memory, language an executive function, (*Id.* 23, 1253, 1258, 1263 1285, 1327, 1331, 1337), Dr. Gulati observed normal mini mental status evaluations, including an intact memory, (*Id.* 22, 972, 977, 979). While the Commissioner is correct that these findings are somewhat contradictory, there is also evidence in the record that supports Dr. Heiman's opinions. For instance, although he concluded the limitations to be only moderate, Dr. Mahoney reasoned that Moore struggles to maintain attention, concentration, a regular schedule, and to perform complex task and interact with others. (*Id.* 989). Dr. Mahoney commented that Moore's psychiatric problems "will interfere with [his] ability to function on a daily basis." (*Id.*) Dr. Mescon also documented Moore's "problems with his memory and concentration," although her recommendation was limited to stating that Moore should avoid heights, driving, and heavy machinery in a work setting. (*Id.* 982–83). Montefiore hospital records from when Moore was admitted post-seizures also document his abnormal mental status. (*Id.* 1077–78, 1082, 1298–1300). Additionally, there is no indication that the ALJ considered these so-called inconsistent opinions in reaching his decision to discount the weight afforded to Dr. Heiman's opinions.

It is for the ALJ to resolve contradictory medical evidence, but "in identifying and resolving these conflicts, the ALJ still must apply the treating physician rule." *Rolon v. Comm'r of Social Security*, 994 F.Supp.2d 496, 506 (S.D.N.Y. 2014).

The ALJ's other major reason for providing Heiman's opinion limited weight is the "limited nature" of Dr. Heiman's treatment notes, I agree that these notes are sparse, and as Moore argues, difficult to read. They also do not appear to document the performance of MSEs or a neuropsychiatric evaluation. However, that does not mean that Dr. Heiman did not perform

these assessments or was unable to provide a more comprehensive rationale for his opinions. ALJs have a responsibility to develop the record, which means that "an ALJ cannot reject a treating physician's diagnosis [or opinion][ without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. "Applicable SSA regulations further require an ALJ to 'seek additional evidence or clarification from [the] medical source when [a] report from [the] medical source contains a conflict or ambiguity that must be resolved' to determine whether the claimant is disabled." *Rolon v. Comm'r of Social Security*, 994 F.Supp.2d 496, 505 (S.D.N.Y. 2014) (alterations in original  (quoting 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2010), *amended,* How We Collect and Consider Evidence of Disability, 77 Fed.Reg. 10,651, 10,656 (Feb. 23, 2012) (deleting former paragraphs (e) and redesignating former paragraphs (f) as paragraphs (e), effective March 26, 2012)). Of course, this "duty to seek clarification applies only to a conflict or ambiguity that *must* be resolved to make the disability determination, minor or irrelevant inconsistencies do not require an ALJ to act upon the duty to further develop the record." *Rolan*, 994 F.Supp.2d at 505.

Here, the ambiguity or lack of clarification the ALJ identified was relevant. As discussed, the ALJ did not make a finding that Dr. Heiman's opinion is inconsistent with substantial evidence in the entire record, so if the opinion had more diagnostic, objective support, it is possible the ALJ would have afforded it controlling weight, or at least more weight.

The ALJ's failure to provide good reasons warrant remand.

### C.  The ALJ properly evaluated Plaintiff's testimony

An ALJ must engage in a two-step process when evaluating a claimant's assertions of his own pain and limitations.

> First, the 'ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the

symptoms alleged.' Second, 'the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'

*Cole v. Calvin*, No. 1:12-CV-08597 (ALC), 2014 WL 1224568, at \*5 (S.D.N.Y. Mar. 24, 2014)

(quoting *Genier v. Astrue*, 606 F. 3d 46, 49 (2d Cir. 2010)). In doing so, the ALJ must consider

the following factors:

> 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; 5) any treatment, other than medication, the claimant has received; 6) any other measures the claimant employs to relieve the pain or other symptoms; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms.

20 C.F.R. § 404.1529(c) (3)(i)-(vii). An ALJ is not obligated to explicitly weigh each

evidentiary factor when assessing a claimant's credibility.  *Pellam v. Astrue,* 508 F. App'x

87, 91 (2d Cir. 2013).

In this case, the ALJ determined that even though Moore's "medically determinable

impairments could reasonably be expected to cause some of the alleged symptoms," his

statements concerning the intensity, persistence, and limiting effects of these symptoms are "not

entirely consistent with the medical evidence and other evidence in the record."  (AR 20-21.)

Because the ALJ's credibility assessment was based, at least in part, on an evaluation of

the treatment record, which may change due to the remand as discussed above, the Court cannot

consider the merits of Moore's claim that the ALJ improperly determined his credibility.

**IV.     CONCLUSION**

For the reasons set forth above, the Commissioner's Motion for Judgment on the

Pleadings is **DENIED** and Plaintiff's Motion for Judgment on the Pleadings is **GRANTED.** The

Commissioner's denial of benefits is **VACATED** and the case is **REMANDED**.

**SO ORDERED.**
Dated: New York, New York
September 28, 2020

_____
Hon. Andrew L. Carter, Jr.
United States District Judge